# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| **MF GLOBAL CAPITAL LLC, individually and on behalf of all others similarly situated,**<br><br>**Plaintiffs,**<br><br>**v.**<br><br>**BANK OF AMERICA CORPORATION; BANK OF AMERICA, N.A.; BARCLAYS BANK PLC; BNP PARIBAS; CITIGROUP, INC.; CITIBANK, N.A.; CITIGROUP GLOBAL MARKETS INC.; CREDIT SUISSE AG; DEUTSCHE BANK AG; GOLDMAN, SACHS & CO.; HSBC BANK PLC; HSBC BANK USA N.A.; INTERNATIONAL SWAPS AND DERIVATIVES ASSOCIATION; MARKIT GROUP LTD.; MORGAN STANLEY & CO., LLC; ROYAL BANK OF SCOTLAND PLC; ROYAL BANK OF SCOTLAND N.V.; UBS AG; AND UBS SECURITIES LLC,**<br><br>**Defendants.** | **Civil Action No. 1:13-cv-5417**<br><br>**CLASS ACTION COMPLAINT**<br><br>**VIOLATIONS OF THE SHERMAN ANTITRUST ACT**<br><br>**JURY TRIAL DEMANDED** |

## <u>TABLE OF CONTENTS</u>

Nature of the Case ...................................................................................................................1

Definition of the Affected Market ...........................................................................................3

Jurisdiction and Venue .............................................................................................................6

Parties .......................................................................................................................................7

A.     Plaintiff ..........................................................................................................................7

B.     Defendants ....................................................................................................................8

C.     Co-Conspirators .........................................................................................................15

Factual Allegations .................................................................................................................18

A.     The Market for Trading Credit Default Swaps ..........................................................18

B.     The Necessity of Counterparty Clearing. ..................................................................20

C.     The Necessity of Real-Time Pricing Information ......................................................24

D.     Defendants Restricted Their Clearing House Joint Venture To Prevent it
from Clearing Trades of Non-Dealers ......................................................................25

E.     Defendants Restricted Their Pricing Information Joint Venture To Prevent
it from Disclosing Real-Time Pricing Information to Customers or Competitors ...........31

F.     Defendants Jointly Prevented the Entry of a Competing CDS Exchange
and Clearing House .....................................................................................................35

G.     Defendants Jointly Denied Non-Dealer Market Participants the
Advantages of Trading Through Brokers ..................................................................44

Market Characteristics Facilitate Restraints of Trade ...........................................................45

A.     Commodity-Like Product ...........................................................................................45

B.     Significant Barriers to Entry .......................................................................................46

C.     Dealer Side of Market Is Concentrated .....................................................................46

D.     Customer Side of Market Is Unconcentrated .............................................................47

E.     Demand Is Inelastic ....................................................................................................47

F.     Market Characterized by Cooperative Practices ........................................................48

        1. ICE Clear Risk Committee Meetings ...................................................................48

        2. Dealings Among Defendants, Intercontinental Exchange, ICE Clear,
and Markit ..............................................................................................................48

        3. International Swaps and Derivatives Association ...................................................49

Government Investigations .....................................................................................................50

A.     2009 Department of Justice Investigation of Anticompetitive Practices in
the CDS Market ..........................................................................................................50

B.     2011 European Commission Investigations Into Abusive Practices in the
CDS Pricing Information and Clearing Markets ........................................................51

Antitrust Violations ................................................................................................................52

Market Power ..........................................................................................................................53

Relevant Market ......................................................................................................................54

Interstate Trade and Commerce ..............................................................................................56

Class Action Allegations ........................................................................................................56

Fraudulent Concealment .........................................................................................................58

Demand for Jury Trial .............................................................................................................60

Prayer for Relief .....................................................................................................................60

i

MF Global Capital LLC ("Plaintiff"), individually and on behalf of a class of all others similarly situated, brings this action for treble damages and an injunction under the antitrust laws of the United States against Defendants, and demands a jury trial.

## NATURE OF THE CASE

1.       Defendant dealers and co-conspirator JP Morgan Chase & Co., the incumbent major dealers of credit default swaps ("CDS") that collectively control over 90 percent of CDS trading in the United States, and Defendants Markit Group Ltd and International Swaps and Derivatives Association, unreasonably restrained competition in the trading of CDS with non-dealer market participants or other interested CDS participants (hereinafter "non-dealers" or "non-dealer market participants") by commonly owning, controlling, and restricting access to a CDS clearinghouse that provides a necessary input to CDS trading known as "clearing"; by commonly owning, controlling, and directing the owner of intellectual property rights in key CDS products, and by using other concerted efforts, to successfully block the entry of an independent CDS exchange and clearinghouse; by jointly preventing brokers from providing exchange-like services to non-dealers; and by jointly denying non-dealers broad access and price discovery to real time CDS bid and ask prices.  The would-be new entrant exchange and clearinghouse, after failing to overcome Defendants' blockade of its entry, agreed with Defendants to delay its market entry, originally planned for 2008.  There is no pro-competitive justification for the Defendants jointly to restrict the availability of clearing and broker services, to restrict pricing information, or to block new entry.  The effect of these activities has been to decrease competition in the CDS market among Defendants and as a result, Defendants' customers, were forced to pay inflated bid/ask spreads, which cushion the profits of the

1

Defendants while harming their CDS customers (the members of the Class defined below).  In such a competitively-restricted market, Defendants' CDS customers must pay more when they buy CDS and are paid less when they sell CDS.  Because of the very large amount of U.S. trading of CDS, involving hundreds of trillions of dollars of notional during the damages period, the resulting harm to the Class members is in the tens of billions of dollars.

2.       The Dodd-Frank Act requires a number of federal agencies to implement regulations.  For example, in Section 765 of the Act, Congress directed the Securities and Exchange Commission to promulgate rules prohibiting conflicts of interest respecting "any clearing agency that clears security-based swaps" including clearing for CDS, in order to, among other things, "promote competition." But, as reported by the New York Times on May 15, 2013, nearly two-thirds of the rules contemplated by the Dodd-Frank Act remain unfinished by a number of overseeing regulatory agencies, with one exception being the Commodity Futures Trading Commission, which has completed most, but not yet all, of its rules.  Regardless of whether all of the responsible agencies have fulfilled their obligations to adopt regulations, the Dodd-Frank Act expressly preserves the right to pursue remedies for violations of the antitrust laws.

3.       Defendants' restriction of competition in the trading of CDS has attracted scrutiny by governmental agencies in the United States and the European Union.  In July 2009, the Antitrust Division of the U.S. Department of Justice opened an investigation regarding "anticompetitive practices in the credit derivatives clearing, trading, and information services industries."  Bloomberg report dated Dec. 29, 2010, quoting DOJ spokeswoman Alissa Finelli. The DOJ antitrust investigation of the Defendants is ongoing.  In April 2011, the antitrust

authority of the European Union issued a press release stating that it, too, is investigating

conduct by the Defendants that is impeding competition in the market for CDS trading.

European Commission Press Release, Antitrust: Commission probes Credit Default Swaps

market, dated April 29, 2011.  On July 1, 2013 the European Commission announced that it had

issued statements of objections (that is, the Commission's preliminary conclusions based on

evidence made available to it) to 13 investment banks, the International Swaps and Derivatives

Association, and Markit, charging them with anti-competitive behavior to block electronic

exchanges from entering the credit derivatives business.

4.     In addition to seeking money damages, the Complaint requests injunctive relief

to foster the competition that has been missing from the CDS market as a result of Defendants'

conspiracy.  Class members are continuing to buy and sell large volumes of CDS, often as a key

part of their strategy to hedge credit risk.  The Department of Justice has pointed out that

impaired competition may have reduced innovations that would otherwise have occurred with

new entry, such as trading CDS on electronic exchanges.  Engendering competition is also

strongly in the public interest.  The government agencies that have studied the CDS market

unanimously have concluded that it provides important risk management and liquidity benefits to

the nation's financial system and the broader economy.

## DEFINITION OF THE AFFECTED MARKET

5.     A financial derivative is an instrument whose value depends on (and thus is

"derived" from) the value of some other underlying asset, such as a stock, bond, or a commodity.

Derivatives permit market participants to manage and transfer risk by allowing them to separate

out and trade individual risk components, such as credit risk.  Derivatives also provide market-

3

based signals to market participants regarding the perceived risk of the underlying instruments on which the derivatives are based.  As the United States Department of Justice ("DOJ") recognized in a December 28, 2010 comment letter to the Securities Exchange Commission ("SEC"), "[p]rotecting competition in th[e derivatives industry] thus is crucially important both for consumers and for the nation's economic health."  As of June 30, 2010, the total gross notional amounts outstanding of over-the-counter derivative contracts traded in the United States had reached $583 trillion.

6.      A credit default swap ("CDS") is a type of financial derivative contract.  It operates much like insurance: one party (the protection buyer) makes quarterly payments to the other party (the protection seller) in exchange for the seller's promise to make the buyer whole on an agreed, or "notional," amount in the event of some "credit event," such as bankruptcy, by a third party, known as the "reference entity."

7.      The payments made by the buyer in exchange for the protection are known as the "premium" and are typically expressed in basis points per annum, that is, one-hundredths of a percent of the notional amount of protection being sold.  While multiple factors affect the premium, a higher CDS premium generally indicates that the perceived risk of the occurrence of a credit event by the reference entity is greater.

8.      The "reference entity" can be a large company, sovereign nation, or state or local government (for example, a corporate "single name" CDS), or it can be a group of companies traded as a credit derivative index (for example, a "corporate index" CDS).  The reference entity is very rarely one of the parties to the swap contract.  Corporate single names and corporate indices account for nearly ninety percent of the outstanding notional value and ninety-five

percent of the traded CDS volume.

9.  In addition to the dealer banks, the buyers and sellers of CDS consist of any person or entity that buys, sells or trades CDS, including, but not limited to, pension funds, endowments, asset managers, brokers and broker-dealers, hedge funds, private investment managers, national and regional banks, foreign banks with U.S. operations, corporations, swaps traders or trading companies, and governmental entities.

10. CDS have a variety of uses, the most basic of which is that the buyer of CDS protection can hedge its principal or notional exposure from a particular liability, such as a bond or loan. Thus, a bank, for example, may choose to "buy protection" through the CDS market in order to hedge a particular reference entity's risk of default on an outstanding bond or loan. In addition, the CDS market, similar to any stock market, has evolved into a mechanism which permits market participants to speculate by monetizing a view of anticipated credit deterioration or appreciation.

11. While a CDS can be customized, the vast majority of CDS traded in the United States and throughout the world are highly standardized and fungible. Most CDS traded in the United States conform to the Standard North American Corporate Contract Specification ("SNAC") and its predecessor, the Conventional Contract. This is a specification promulgated by the International Swaps and Derivatives Association ("ISDA") that standardizes almost all CDS terms and normally allows for just five variables: reference entity, upfront payment amount, notional amount, maturity date, and currency. The SNAC specifies that the underlying debt obligation referenced on a CDS contract, a senior unsecured bond most commonly, be a specific outstanding obligation of the reference entity. This requirement ensures that the credit

5

ranking of the underlying debt is standardized across CDS traded for a particular reference entity. So, for example, if Investor A and Investor B independently trade $5 million of 5-year Kraft Global Foods Inc. CDS at the same time, the only variable would be the execution spread. Consequently, CDS are standardized, commodity-like products that are susceptible to trading, and are ideally suited for listed or exchange trading.

12.     For purposes of this Complaint, CDS means all single-name CDS and index CDS, traded in the United States, and purchased or sold by United States or foreign investors, that utilize the Conventional Contract or Standard North American Contract and were purchased by Class Members directly from Defendants or sold by Class Members directly to Defendants from October 7, 2008 through the present date (the "Class Period" or "relevant time period").

## JURISDICTION AND VENUE

13.     Plaintiff brings this action under Section 4 of the Clayton Act, 15 U.S.C. § 15, to recover treble damages and costs of suit, including reasonable attorneys' fees, against Defendants for the injuries that Plaintiff and the other Class members have suffered from Defendants' violations of Section 1 of the Sherman Act, 15 U.S.C. § 1.

14.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1337 and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) and 26.

15.     Venue is proper in this District pursuant to 15 U.S.C. §§ 15(a) and 22 and 28 U.S.C § 1391(b), (c) and (d) because during the Class Period, all the Defendants resided, transacted business, were found, or had agents in this District; a substantial part of the events or omissions giving rise to these claims occurred in this District; and a substantial portion of the affected interstate trade and commerce discussed herein has been carried out in this District.

This Court has personal jurisdiction over each Defendant, because each Defendant: transacted business throughout the United States, including in this District; bought and sold CDS to Class members throughout the United States, including Class members residing or located in this District; had substantial contacts with the United States, including in this District; and/or committed overt acts in furtherance of their illegal scheme and conspiracy in the United States. In addition, the conspiracy was directed at, and had the intended effect of, causing injury to persons residing in, located in, or doing business throughout the United States, including in this District.

16.     The activities of Defendants and their Co-Conspirators were within the flow of, were intended to, and did have a substantial effect on the foreign and interstate commerce of the United States.

## PARTIES

### A. Plaintiff

17.     Plaintiff MF Global Capital LLC ("MF Global Capital" or "Plaintiff") conducted primarily over-the-counter foreign exchange, prime brokerage and energy commodity and credit default swaps brokerage services for customers and affiliated entities. As a derivatives broker, MF Global participated in the CDS market as a "buy-side" customer and purchased CDS directly from and sold CDS directly to one or more Defendant dealers during the Class Period. MF Global Capital filed a voluntary petition for relief in the United States Bankruptcy Court for the Southern District of New York under Chapter 11 of the Bankruptcy Code on December 19, 2011 and is presently liquidating pursuant to its confirmed Second Amended and Restated Joint Plan of Liquidation that became effective on June 4, 2013.

B. **Defendants**

18.     Defendant Bank of America Corporation is a corporation organized and existing

under the laws of the State of Delaware, with its principal place of business in Charlotte, North

Carolina. Defendant Bank of America, N.A. is a wholly owned subsidiary of Defendant Bank of

America Corporation. Defendants Bank of America Corporation and Bank of America, N.A. are

collectively referred to as "Bank of America." Bank of America is one of the world's largest

financial institutions, serving individual consumers, small- and middle-market businesses, and

large corporations with a full range of banking, investing, asset management, and other financial

and risk management products and services. Lending, derivatives, and other commercial

banking activities are performed by affiliates of Bank of America, including Bank of America

Merrill Lynch and Bank of America, N.A. From the fourth quarter of 2008 through the fourth

quarter of 2010, Bank of America bought and sold approximately $30.8 trillion (notional value)

of CDS. During the Class Period, Bank of America and/or its affiliates directly sold CDS to and

bought CDS from members of the Class. During the Class Period, Bank of America was a

clearing member of ICE Clear Credit, LLC ("ICE Clear") and an owner of Markit, and

representatives of Bank of America sat on the boards of ISDA and Markit and on ICE Clear's

Risk Committee.

19.     Defendant Barclays Bank plc is a corporation organized under the laws of the

United Kingdom. "Barclays" includes its broker-dealers subsidiaries, including Barclays Capital

(a broker/dealer registered with the Financial Industry Regulatory Authority, which regulates

broker-dealers and other companies selling securities to the public in the United States), that

provide CDS clearing and/or settlement services. Barclays is a financial services firm that

employs 145,000 people in over 50 countries. The company is organized into two clusters: Retail and Business Banking (which includes UK Retail and Business Banking, Barclaycard, Europe Retail and Business Banking and Africa Retail and Business Banking) and Corporate & Investment Banking and Wealth Management (which includes Barclays Capital, Barclays Corporate and Barclays Wealth). Barclays Capital, the parent company's investment banking division, is actively involved in equity, commodity trading, fixed income, foreign exchange, and credit activities. During the Class Period, Barclays and/or its affiliates directly sold CDS to and bought CDS from members of the Class. During the Class Period, Barclays was a clearing member of ICE Clear and an owner of Markit, and representatives of Barclay's sat on the board of ISDA and on ICE Clear's Risk Committee.

20.     Defendant BNP Paribas is a French banking company that maintains offices and transacts business in Chicago, Illinois. BNP Paribas is a CDS dealer and acts as a counterparty in CDS transactions. During the Class Period, BNP Paribas and/or its affiliates directly sold CDS to and bought CDS from members of the Class. Representatives of BNP Paribas sit on the Board of ISDA. BNP Paribas is a shareholder of Markit.

21.     Defendant Citibank N.A. is a wholly owned subsidiary of the United States financial services corporation Defendant Citigroup, Inc. Citibank N.A. and Citigroup, Inc. maintain their principal places of business in New York, New York. Citigroup is a financial services company with one of the world's largest financial services networks. Defendant Citigroup Global Markets Inc. is the United States based brokerage and securities arm of Defendant Citigroup, Inc. Citibank N.A., Citigroup, Inc. and Citigroup Global Markets, Inc. are collectively referred to as "Citigroup." Citigroup's Institutional Clients Group comprises Citi

9

Markets & Banking ("CMB") and Citi Alternative Investments. CMB is divided into two primary businesses, Global Capital Markets and Banking and Global Transaction Services. The former provides investment and commercial banking services covering institutional brokerage, advisory services, foreign exchange, structured products, derivatives, loans, leasing, and equipment finance. The latter offers cash-management, trade finance, and securities services to corporations and financial institutions. From the fourth quarter of 2008 through the fourth quarter of 2010, Citigroup bought and sold approximately $22.3 trillion (notional value) of CDS. During the Class Period, Citigroup directly sold CDS to and bought CDS from members of the Class. Representatives of Citigroup sit on the board of ISDA and ICE's Risk Committee. During the Class Period, Citigroup was a clearing member of ICE Clear and an owner of Markit.

22. Defendant Credit Suisse AG is a corporation organized under the laws of Switzerland. Credit Suisse AG is a global financial services firm that provides products and services to private, corporate, and institutional clients through three main business areas: Private Banking, Investment Banking, and Asset Management. During the Class Period, Credit Suisse AG and/or its affiliates, directly sold CDS to and bought CDS from members of the Class. During the Class Period, Credit Suisse Group AG was a clearing member of ICE Clear and an owner of Markit, and representatives of Credit Suisse sat on the board of ISDA and on ICE Clear's Risk Committee.

23. Defendant Deutsche Bank AG is a German corporation with its headquarters in Frankfurt, Germany. "Deutsche Bank" includes its broker-dealer subsidiaries and affiliates, including Deutsche Bank AG, London Branch, that provide CDS clearing and/or settlement services. Deutsche Bank has a large presence in Europe, the Americas, Asia Pacific, and

10

emerging markets, and maintains offices in major financial centers, including New York. It offers financial products and services for corporate and institutional clients along with private and business clients, including sales, trading, and origination of debt and equity; mergers and acquisitions; risk management products, such as derivatives; corporate finance; wealth management; retail banking; fund management; and transaction banking. From the fourth quarter of 2008 through the fourth quarter of 2010, Deutsche Bank bought and sold approximately $508 million (notional value) of CDS. During the Class Period, Deutsche Bank and/or its affiliates directly sold CDS to and bought CDS from members of the Class. During the Class Period, Deutsche Bank was a clearing member of ICE Clear and an owner of Markit, and representatives of Deutsche Bank sat on the board of ISDA and on ICE Clear's Risk Committee.

24. Defendant Goldman Sachs & Co. is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in New York, New York. "Goldman Sachs" includes its broker-dealer subsidiaries and affiliates, including Goldman Sachs International that provides CDS clearing and/or settlement services. Goldman Sachs is a global investment banking, securities, and investment management firm that provides a wide range of financial services to a substantial client base that includes corporations, financial institutions, governments, and high-net-worth individuals. Goldman Sachs's activities are divided into three segments, one of which is Trading and Principal Investments. In that segment, the firm facilitates client transactions with corporations, financial institutions, investment funds, governments, and individuals through market making in, trading of, and investing in fixed income and equity products, currencies, commodities, and derivatives of these products. The firm also takes proprietary positions on some of these products. From the fourth quarter of 2008

through the fourth quarter of 2010, Goldman Sachs bought and sold approximately $6.6 trillion (notional value) of CDS. During the Class Period, Goldman Sachs and/or its affiliates directly sold CDS to and bought CDS from members of the Class. During the Class Period, Goldman Sachs was a clearing member of ICE Clear and an owner of Markit, and representatives of Goldman Sachs sat on the boards of ISDA and Markit and on ICE Clear's Risk Committee.

25.     Defendant HSBC Bank plc is a wholly owned subsidiary of HSBC Holdings plc, a United Kingdom public company with its headquarters in London, England. Defendant HSBC Bank USA N.A. has its main offices located in McLean, Virginia and is a subsidiary of HSBC Holdings plc. Defendants HSBC Bank plc and HSBC Bank USA N.A. are collectively referred to as "HSBC." HSBC maintains offices and transacts business in Chicago, Illinois. HSBC is a CDS dealer and acts as a counterparty in CDS transactions. Representatives of HSBC sit on the boards of ISDA and Markit. HSBC is a shareholder of Markit.

26. Defendant International Swaps and Derivatives Association ("ISDA") is a financial trade association representing participants in the OTC derivatives market. Its members include the Dealer Defendants, which control ISDA through seats on its board of directors. ISDA's board is chaired by Stephen O'Connor, a former managing director of Morgan Stanley, and its members also include Gerhard Seebacher of Bank of America, Harry Harrison of Barclays, Guillaume Amblard of BNP Paribas, Biswarup Chatterjee of Citibank, Eraj Shirvani of Credit Suisse, Richard Herman of Deutsche Bank, R. Martin Chavez of Goldman Sachs, Elie El Hayek of HSBC, and Diane Genova of JP Morgan.

27. Defendant Markit Group Ltd. ("Markit") is a private financial information company headquartered in London, England and is owned, in part, by 16 shareholder banks, including

Bank of America, Barclays, BNP Paribas, Citigroup, Credit Suisse, Deustche Bank, Goldman

Sachs, HSBC, JP Morgan, Morgan Stanley, Royal Bank of Scotland, and UBS. According to

2009 filings at U.K. Companies House, Bank of America (including its subsidiary, Merrill

Lynch), Barclays, Deutsche Bank, Goldman Sachs, JP Morgan, and Royal Bank of Scotland

collectively owned 30% of Markit. Dealer Defendants and their Co-Conspirators control Markit

through seats on its board of directors. Markit's board members include Shea Zane Walton of

Bank of America, Paul Walker of Goldman Sachs, Niall Cameron of HSBC, Jeremy Barnum of

JP Morgan, and Dexter Emory Senft of Morgan Stanley.

28.     Defendant Morgan Stanley & Co., LLC is a subsidiary of Morgan Stanley, a

global financial services company that maintains and transacts business in Chicago, Illinois.

Morgan Stanley & Co., LLC (which will be referred to as "Morgan Stanley") provides CDS

clearing and/or settlement services. Morgan Stanley is a global financial services firm that,

through its subsidiaries and affiliates, provides products and services, including securities, asset

management and credit services, to a large group of clients and customers, including

corporations, governments, financial institutions, and individuals. Under the firm's Institutional

Securities segment, it trades, makes markets and takes long and short proprietary positions

globally in listed futures and OTC swaps, forwards, options and other derivatives referencing,

among other things, interest rates, currencies, investment grade and non-investment grade

corporate credits, loans, bonds, U.S. and other sovereign securities, emerging market bonds and

loans, credit indices, asset-backed security indices, property indices, mortgage-related and other

asset-backed securities and real estate loan products. From the fourth quarter of 2008 through

the fourth quarter of 2010, Morgan Stanley bought and sold approximately $189 billion (notional

value) of CDS.  During the Class Period, Morgan Stanley and/or its affiliates directly sold CDS

to and bought CDS from members of the Class.  During the Class Period, Morgan Stanley was

also a clearing member of ICE Clear and an owner of Markit, and representatives of Morgan

Stanley sat on the boards of ISDA and Markit and on ICE Clear's Risk Committee.

29.     Defendant Royal Bank of Scotland plc is a primary operating bank of the Royal

Bank of Scotland Group plc, which is a British corporation with regional offices in Stamford,

Connecticut.  Defendant Royal Bank of Scotland, N.V. operates as a subsidiary of RBS Holdings

N.V.  "Royal Bank of Scotland Group PLC" includes its broker-dealers subsidiaries and

affiliates, including RBS Securities Inc., a wholly owned subsidiary of RBS Holdings USA Inc.

and a registered Securities and Exchange Commission broker-dealer.   RBS Securities Inc. is

primarily involved in the sale and purchase of asset-backed, U.S. Treasury, equity and debt

securities, and exchange-traded future and options clearing and execution.  As of June 2011,

RBS Securities Inc, reported over $137 billion in total assets and remains one of the largest

liquidity providers in the United States.  During the Class Period, Royal Bank of Scotland Group

PLC and/or its affiliates directly sold CDS to and bought CDS from members of the Class.

During the Class Period, Royal Bank of Scotland Group PLC was a clearing member of ICE

Clear and an owner of Markit.

30.     Defendant UBS AG is a Swiss global financial services corporation with

regional offices in New York, New York and Stamford, Connecticut.  "UBS AG" includes its

broker-dealer subsidiaries and affiliates, including Defendant UBS Securities LLC, a wholly

owned subsidiary of UBS AG.  UBS Securities LLC is a registered broker-dealer and the top

combined share trader on the New York Stock Exchange and NASDAQ.  UBS AG employs

65,000 people in over 50 countries and is organized into four main business areas: Wealth Management & Swiss Bank, Global Asset Management, Wealth Management Americas, and the Investment Bank. The Investment Bank's trading activity is conducted through UBS Securities LLC. During the Class Period, UBS AG and/or its affiliates directly sold CDS to and bought CDS from members of the Class. During the Class Period, UBS AG was a clearing member of ICE Clear and an owner of Markit and representatives of UBS AG sat on ICE Clear's Risk Committee.

## C. Co-Conspirators

31.     Various other individuals, firms, and corporations, not named as Defendants herein, have participated as co-conspirators with Defendants and performed acts and made statements in furtherance of the conspiracy. Certain of those co-conspirators are identified below, and Plaintiff reserves the right to name subsequently some or all co-conspirators, whether identified here or not, as defendants.

32.     Co-Conspirator ICE Clear is a limited liability company organized under the laws of the State of Delaware, with its principal place of business in New York. ICE Clear began operating as a central clearing facility for CDS contracts on March 9, 2009, and continues to act as a central counterparty to clear CDS transactions between the Defendants and between the Defendants and other dealers. ICE Clear was formerly known as ICE Trust U.S. LLC (and before that as ICE US Trust, LLC), and is wholly owned by ICE US Holding Company L.P. ("ICE LP"). ICE LP is a Cayman Islands exempted limited partnership. ICE US Holding Company GP LLC ("ICE GP") owns 50 percent of and is the general partner of ICE LP. ICE GP is a Delaware limited liability corporation that is wholly owned by Co-Conspirator

15

IntercontinentalExchange Inc. ("ICE"). Other owners of ICE LP include Citigroup, Deutsche Bank, Goldman Sachs, JP Morgan, and Morgan Stanley, as well as Merrill Lynch, which is owned by Defendant Bank of America. ICE and Defendants each share in ICE Clear's profits. ICE Clear is also an affiliate of Creditex, which jointly administers the Credit Event Fixing Product with Defendant Markit.

33.     Co-Conspirator IntercontinentalExchange Inc. ("ICE") is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in Atlanta, Georgia. ICE has offices in key market centers around the globe, including at 353 North Clark Street, Chicago, Illinois. ICE is an operator of regulated futures exchange and over-the-counter ("OTC") markets and derivatives clearing houses. It operates electronic futures and OTC marketplaces for trading an array of energy and agricultural commodities, credit default swaps, currencies and equity index products. It offers an integrated electronic trading platform for side-by-side trading of products in both futures and OTC markets (but not credit default swaps), together with clearing, post-trade and market data services. In March 2009, through its subsidiary ICE Clear, ICE became the first clearinghouse to process CDS transactions in the United States, and to this day clears the vast majority of all CDS transactions, and all dealer-to-dealer CDS transactions, in the United States. It is the ultimate parent company of ICE Clear, and shares ICE Clear's revenues with the six Defendants. ICE owns 100% of Creditex.

34.     Co-Conspirator GFI Group, Inc. ("GFI") is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in New York, New York. GFI provides brokerage services, trade execution, market data, trading platforms, and other software products to institutional customers in markets for a range of fixed income,

16

financial, equity, and commodity instruments. These services include voice brokerage services and an electronic dealer platform, which GFI makes available only to dealers. In or about December 2006, GFI acquired a minority stake in The Clearing Corp. ("TCC") which has its corporate office at 353 North Clark Street, Chicago, Illinois. TCC is one of the country's oldest clearing organizations and, in addition to GFI, was owned by Bank of America, Barclays, Citigroup, Deutsche Bank, Goldman Sachs, JP Morgan, Morgan Stanley, UBS, Merrill Lynch, Creditex, Markit, Eurex, ICAP, and MF Global. GFI then worked with TCC to develop the technology for clearing CDS, including the setting of initial and variation margins. These owners sold TCC to ICE in March 2009 as part of the formation of ICE Clear.

35.     Co-conspirator JP Morgan Chase & Co. is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in New York, New York. JPMorgan Chase Bank, N.A. is a principal bank subsidiary of JP Morgan Chase & Co. JP Morgan Chase & Co. and JPMorgan Chase Bank, N.A. are collectively referred to as "JP Morgan." JP Morgan is a global financial services firm with assets of $2 trillion and operations in more than 60 countries. The firm is a leader in investment banking, financial services for consumers, small business and commercial banking, financial transaction processing, asset management, and private equity. It also provides CDS clearing and/or settlement services. The firm's Global Derivatives Services provides OTC derivative processing services to buy-side clients, including asset managers, pension funds, sovereign wealth funds, hedge funds and other institutions which trade OTC derivatives as a component of their strategies. From the fourth quarter of 2008 through the fourth quarter of 2010, JP Morgan bought and sold approximately $56.6 trillion (notional value) of CDS. During the Class Period, JP Morgan and/or its affiliates

directly sold CDS to and bought CDS from members of the Class. During the Class Period, JP

Morgan was a clearing member of ICE Clear and an owner of Markit, and representatives of JP

Morgan sat on the boards of ISDA and Markit and on ICE Clear's Risk Committee.

36.     Whenever in this Complaint reference is made to any act, deed, or transaction of

any corporation, the allegation means that the corporation engaged in the act, deed, or transaction

by or through its officers, directors, agents, employees, or representatives, or by or through the

officers, directors, agents, employees, or representatives of the corporation's affiliate, parent,

division or subsidiary, while they were actively engaged in the management, direction, control,

or transaction of the business or affairs of the corporation, affiliate, division or subsidiary..

## FACTUAL ALLEGATIONS

### A. The Market for Trading Credit Default Swaps

37.     The dealer Defendants and Co-Conspirator JPMorgan dominate the trading of

CDS. According to statistics from the Office of Comptroller of the Currency's *Quarterly Report*

*on Bank Trading and Derivatives Activities* (covering U.S-based bank holding companies and

not reflecting activity by institutions based outside of the U.S.) from the fourth quarter of 2008

through the fourth quarter of 2010, Defendants and Co-Conspirator JPMorgan bought and sold

$116 trillion in CDS, or approximately 93 percent of all CDS transactions (by notional value)

bought and sold by US-based bank holding companies during that period.

38.     At present approximately $30 trillion of CDS is traded annually. An average of

3,000 single-name CDS trades ($25 billion in notional value) and 1,450 CDS index transactions

($74 billion) are made every day, according to a report by the Federal Reserve Bank of New

York.

39.     From the inception of CDS trading in the United States, all CDS have been traded bilaterally over the counter ("OTC"), as opposed to being traded on organized exchanges or being cleared via organized clearinghouses such as those that exist for commodities, bonds, and other securities.  As a result of this structure, non-dealer market participants cannot, as a practical matter, buy and sell CDS with one another.  In the absence of an exchange, non-dealer market participants have no efficient way to find other non-dealers that want to trade the same CDS.  Market participants therefore can only buy and sell CDS by transacting bilaterally with CDS dealers, which, in this middleman role, are called "market makers" because they generally are ready sellers for those seeking to buy CDS and ready buyers for those seeking to sell CDS. As a result of Defendants' success in preventing the introduction of exchange trading and clearing, and denying non-dealers access to broker services, a dealer bank has been on at least one side of virtually every CDS transaction since market inception.

40.     Customers wanting to buy or sell CDS enter into a series of agreements with one or more of the Defendant dealers using forms specified by ISDA.  These documents include a Master Agreement, one or more Confirmation Letters (usually one for every trade of a specific CDS), the ISDA Credit Derivatives Definitions, ISDA Supplements to the Definitions, and Credit Support Documentation.  The Defendant dealers have executed these ISDA agreements, which are necessary to trade CDS, with substantial networks of customers.

41.     After two parties enter a CDS contract, they each submit the details of the transaction to a trade matching and confirmation service.  The service compares the trade information delivered by each of the counterparties and reports matches (or mismatches) in real-time.  Once any mismatches are resolved, the trade is confirmed electronically.  ICE Link (an

19

affiliate of ICE Clear Credit) and MarkitServ are the major trade and confirmation matching services. The details of confirmed trades are then reported to the Trade Information Warehouse ("TIW"), a comprehensive database that contains the primary record of each CDS contract. TIW stores all electronically confirmed CDS trades, and over 95% of all global CDS trades.

42.     As a market maker, a dealer may both buy and sell a given CDS, but will do so at different prices. That is, the dealer will buy (or bid) CDS protection at a lower price than it will sell (or offer) the same protection. The difference between the bid price and the ask price for a given CDS is the "bid/ask spread." The bid/ask spread is a major source of the dealers' profits and a significant part of non-dealers' cost in executing CDS transactions. Indeed, some dealers attempt to keep a "balanced book" (i.e., their CDS sales offset their CDS purchases), and generate profits on the bid/ask spread. The wider the bid/ask spread, the greater the dealers' revenues and profits. The bid/ask spread for a CDS transaction can easily exceed $100,000.

43.     Dealer-to-dealer transactions account for approximately 80% of all open positions in the CDS market and most of these are done to either net out the dealers' trades with non-dealers or proprietarily position risk. According to "The Failure Mechanics of Dealer Banks," an article by Stanford Graduate School of Business Professor Darrell Duffie in the Winter 2010 edition of the *Journal of Economic Perspectives*, as of June 2009, a notional total of $28 trillion for all CDS, and a gross notional total of $23 trillion in dealer-to-dealer transactions, was outstanding in the market, whereas dealers' net exposures for CDS totaled $3 trillion.

44.     In the first six months of 2009, the Defendants earned billions of dollars from trading in both derivatives, including interest-rate swaps and CDS, and cash instruments such as Treasuries and corporate bonds.

20

45.     Defendants themselves recognize their collective dominance. As UBS's 2009 Annual Report notes: "Our main competitors continue to be the major global investment banks including Bank of America/Merrill Lynch, Barclays Capital, Citigroup, Credit Suisse, Deutsche Bank, Goldman Sachs, JP Morgan Chase and Morgan Stanley."

46.     Smaller dealers have not undercut the bid/ask spreads obtained by Defendant dealers. Smaller dealers, which have been able to maintain a presence in the CDS market, have tended to do so by having access to distribution channels less available to Defendant dealers. But the smaller dealers remain small because they do not have access to the broad two-way customer flow that the Defendant dealers have access to, and because they lack essential access to clearing. The smaller dealers are forced to trade CDS with Defendant dealers as market makers to offset the smaller dealers' trades with their non-dealer customers, and thus are vulnerable to possible retaliation by Defendant dealers if the smaller dealers sought to compete more directly and aggressively against Defendant dealers. Moreover, as a result of the 2008 financial crisis, several smaller dealers have exited the CDS market or reduced their trading volume in part because of lower risk tolerance. The financial crisis also caused the disappearance of synthetic collateralized debt obligations (SCDOs), which many smaller dealers had sold and which had generated much of their demand for CDS. Thus, the smaller dealers were much less of a presence in the CDS market beginning in 2008 and in any event have for years been niche players, relying on established relationships in limited distribution channels.

47.     Some of the larger hedge funds and other non-dealers have been interested in trading CDS with other non-dealers in competition with Defendant dealers, but they have been blocked from doing so by Defendants' conspiracy.

21

### B. **The Necessity of Counterparty Clearing**

48.     A CDS trade requires future performance by both parties, typically for a period of five years.  For five years, the buyer of protection agrees to pay a premium and the seller of protection agrees to pay a notional value should the referenced credit event occur.  During the five years, both parties are exposed to a risk of "counterparty default."  A counterparty default would occur if a buyer is unable to make the contractual premium payments or if the seller is unable to pay out the notional value of the CDS in the event of a credit event.

49.     The counterparty default risk in CDS transactions is a substantial barrier to entry. Because of counterparty risk, potential customers are not willing to bilaterally trade CDS in significant volumes with parties that do not have very substantial capital.  As a practical matter, only the largest banks have sufficient capital to assure potential customers that their risk of default is low.  Thus, absent access to clearing, only the largest banks have sufficient capital to bilaterally buy and sell CDS as market makers in more than small volumes.

50.     Counterparty default risk can be reduced by "clearing," which has the effect of both collateralizing and distributing counterparty risk over a pool of counterparties.  When a CDS transaction is cleared the parties are insulated from each other's default by a central counterparty, typically called a clearinghouse.  The clearinghouse stands between the two original counterparties, acting as the seller to the original buyer, and as the buyer to the original seller.  Clearinghouses are commonly used in securities markets to manage and reduce counterparty risk.

51.     A clearinghouse spreads counterparty risk across the members of the clearing house, effectively reducing each member's risk to a manageable level.  The clearinghouse

requires both parties to a CDS trade to post an initial margin and to continuously update their margin through a "variation margin" that is tied to the CDS's current market value. Clearinghouses also require their members to contribute capital to a reserve fund (the "guaranty fund") that can be used, if necessary, to meet the financial obligations of a defaulting clearing member. As a further backup, clearing houses contribute to their own guaranty funds in addition to having the right to assess their members for any losses that the first two mechanisms may fail to cover. This creates a multi-tiered waterfall of insurance to protect the financial integrity of the clearinghouse.

52. Because it eliminates the barrier of counterparty risk, clearing facilitates exchange trading of standardized CDS. In fact, standardized financial products with the potential for reasonably high trade volume, such as single name CDS and CDS indices, are natural candidates for exchange trading.[1] Because the CDS trades would be guaranteed by the clearinghouse, from a risk perspective the clearinghouse becomes the counterparty. Market participants thus would not need to assess the creditworthiness of the party on the other side of the transaction, and could trade anonymously over an exchange, as is the case with securities and futures. Lack of clearing inhibits exchange trading, because market participants need assurance that their counterparty does not present an unacceptable risk of default (or must mitigate that risk through posting of margin or other mechanisms).

53. Clearinghouses provide the additional benefit of allowing a party to net multiple, offsetting trades of a particular CDS product to reduce the total amount of margin it must post.

---

[1] Darrell Duffie, Dark Markets: Asset Pricing and Information Transmission in Over-the-Counter Markets, at 5 (Princeton Univ. Press 2012).

The clearinghouse requires a party to post margin only on the net amount of its positions. For example, assume that Dealer X sells $750 million in CDS protection for a certain reference entity to Dealer Y, and in a separate transaction purchases $500 million in CDS protection for that same reference entity from Dealer Z. The clearinghouse becomes the counterparty to both transactions, and requires Dealer X to post margin only on the net exposure Dealer X has to the clearing house: $250 million. A clearinghouse thus facilitates netting of CDS contracts. Without a clearing-house, Dealer X would have to post margin for both its $750 million exposure to Dealer Y, and for its obligation to pay premiums to Dealer Z. Similarly, the total exposure of the clearinghouse is only the net amount of exposure after accounting for offsetting trades.

54.     In contrast to the CDS market, there are about 50 firms making markets in the interest rate swaps market, which also has more than one clearinghouse. Interest rate swaps trade on much narrower bid-ask spreads than do CDS.

## C.  The Necessity of Real-Time Pricing Information

55.     Price transparency is important to participants in all financial markets, including the CDS market. Such data permit buyers and sellers to make informed trading decisions. As one market commentator described the situation, "pricing data is the 'oxygen' that enables financial markets to thrive." R. E. Litan, *The Derivatives Dealers' Club and Derivatives Market Reform: A Guide for Policy Makers, Citizens and Other Interested Parties*, The Brookings Institute, April 7, 2010, at 8-9. The lack of pricing transparency greatly reduces the number of dealers that customers can practically consider transacting with. The lack of pricing transparency disadvantages would-be competing dealers.

**D. Defendants Jointly Prevented Non-Dealers from Becoming or Growing as Market Makers By Denying Them Access to Clearing**

56.     Through their control over ICE Clear and its key committees, and their dominance of the CDS market, the Defendant dealers have controlled which entities can clear CDS transactions.  They have done so jointly by (1) collectively controlling ICE Clear and using that control to set its membership rules and clearing rights far more restrictively than could be justified by any legitimate need to limit counter-party risk, (2) using Markit, in which they collectively have a controlling ownership interest, and ISDA, which they also control, to force a rival clearinghouse to cede control of its operations to Defendant dealers, as a condition of Markit and ISDA licensing critical intellectual property rights to the clearinghouse, (3) using their resulting control of the competitor clearinghouse to set unreasonably restrictive rules designed to, and which did, inhibit its growth, and (4) clearing their trades on ICE Clear rather than on the rival clearinghouse.

57.     In the CDS market, a single clearing house, ICE Clear Credit LLC ("ICE Clear"), formerly known as ICE Trust U.S. LLC, has served as the clearing house for almost all cleared CDS transactions since March 2009.  As of February 17, 2012, ICE Clear had cleared over $16 trillion in gross notional value, of which $14.5 trillion was North American CDS indices and $1.5 trillion was single-name CDS.

58.     Defendant dealers have controlled ICE Clear since its formation in December 2008.  ICE Clear is wholly owned by ICE LP, which in turn is owned 50 percent by ICE GP and 50 percent by, among others, Goldman Sachs, Citigroup, JP Morgan, Morgan Stanley, Deutsche Bank, and Merrill Lynch (which is owned by Defendant Bank of America).  ICE and the Defendant dealers each share in ICE Clear's profits.

25

59.     On information and belief, Defendant dealers participated integrally in the formation of ICE Clear so that they could control it and thus control access to CDS clearing. Clearing had not previously existed in the CDS market, but Defendant dealers anticipated that the government would eventually require it.  The Defendant dealers were at the center of the transactions that led to ICE Clear's formation.

60.     The first step in the creation of ICE Clear was ICE's purchase of The Clearing Corp. ("TCC"), which was owned primarily by the Defendant dealers, in the fall of 2008.  The Defendant dealers had acquired TCC in a transaction directed by Defendant Goldman Sachs and its principal strategies group.

61.     The Defendant dealers insisted on numerous conditions for the deal to proceed with ICE.  For example, they required ICE to appoint the chief executive of TCC, Dirk Pruis, as the head of ICE Clear.  Pruis left ICE after about one year to work at Defendant Goldman Sachs. The Defendant dealers also refused to allow the sale to close until the clearing house's rulebook was finalized, with key provisions favoring the Defendant dealers and unreasonably denying membership to Defendants' potential competitors, as alleged in more detail below.

62.     When ICE Clear was formed, it had ten clearing members:  seven of the Defendant dealers, plus Merrill Lynch, which is now owned by Defendant Bank of America and Co-Conspirator JPMorgan.  Today, ICE Clear has twenty-six clearing members, though a number of the members are subsidiaries or affiliates of one another.

63.     ICE Clear is governed by an 11-member Board of Managers.  Four of the Board's Managers are nominated by ICE Clear's 12-member Risk Committee, which, under ICE Clear's rules, must include six Defendant dealer representatives.  On information and belief, at

least nine of the Defendant dealers and Co-Conspirators are currently represented on the Risk Committee through the following individuals: Thomas J. Benison, a Managing Director at JP Morgan; James J. Hill, a Managing Director at Morgan Stanley; Anthanassios Diplas of Deutsche Bank; Paul Hamill of UBS; Paul Mitrokostas of Barclays; Andy Hubbard of Credit Suisse; Oliver Frankel of Goldman Sachs; Ali Balali of Bank of America; and Biswarup Chatterjee of Citigroup. Together, ICE Clear's Board of Managers and Risk Committee set ICE Clear's management policies and standards, including minimum capital requirements and margins for clearing members. As alleged more fully below, ICE Clear set its net capital requirements to permit the largest 13 banks, and no others, to become members.

64. ICE Clear's membership consists of a small number of large banks, bank holding companies and subsidiaries of bank holding companies, all of which are CDS dealers, and includes all of the Defendant dealers.

65. ICE Clear has restricted the benefits of its clearing to its members. Non-members do not have the right under ICE Clear's rules to clear CDS on that clearinghouse. While Defendant dealers clear the CDS trades they have done with non-dealers, Defendant dealers routinely deny their customers' requests to open a clearing account. Such an account would permit hedge funds and other "buyside" entities to become market makers in competition with Defendant dealers, because they could then clear all of their trades on ICE Clear, whether the trade was executed with a dealer or another non-dealer. Defendant dealers are careful to avoid opening a clearing account with any customer that they believe might seek to compete with them to make markets in CDS.

66. A key means by which the Defendant dealers have jointly excluded potential

27

competitors is by setting unreasonably and unnecessarily high capital requirements for membership in ICE Clear. Initially, they required members to have at least $5 billion in adjusted net capital.

67.     This restriction has excluded not just smaller dealers and brokers, but also large Future Commission Merchants ("FCM") and firms such as the State Street Corporation and brokerage firms such as MF Global and Newedge. Marcus Katz, a senior vice president at Newedge, which is owned by two large French banks, believes that the criteria for membership in ICE Clear are arbitrary. Said Mr. Katz: "It appears that the membership criteria were set so that a certain group of market participants could meet that, and everyone else would have to jump through hoops."

68.     There is no legitimate reason to impose such high, across-the-board adjusted net capital requirements. ICE Clear could have scaled capital requirements to the volume of trading activity and risk introduced into the clearinghouse, thereby protecting the safety and soundness of its clearing operation and the counterparties who deal with it. It was not until ICE Clear was mandated to lower its adjusted net capital requirement that it reluctantly did so, because a flat $5 billion capital threshold keeps out independent dealers and end users, whose ability to clear CDS would enhance competition in the making of CDS markets and would thereby lower CDS spreads.

69.     In contrast, the CME clearinghouse initially required that dealers have only $500 million in adjusted net capital to join. As alleged below, despite this lower membership hurdle, smaller dealers and buy-side firms had little or no access to the CME clearinghouse because Defendants have utilized other means to restrict their access.

28

70.     The Commodity Futures Trading Commission has adopted regulations governing clearinghouse membership requirements in derivatives markets that highlight the unreasonableness of ICE Clear's membership requirements.  The regulations require a DCO (*i.e.*, a derivatives clearing organization or clearinghouse) to establish "capital requirements that are based on objective, transparent, and commonly accepted standards that appropriately match capital to risk."  17 C.F.R. § 39.12(a)(2)(ii).  The regulations further require that "capital requirements shall be scalable to the risks posed by clearing members."  *Id.*  Under the regulations, a DCO "shall not set a minimum capital requirement of more than $50 million for any person that seeks to become a clearing member in order to clear swaps."  *Id.* at § 39.12(a)(2)(iii).  The regulations also require each clearing member to hold capital proportional to its risk exposure.  *See id.* at § 39.12(a)(3).

71.     In anticipation of the CFTC's action, in July 2011 ICE Clear lowered its membership requirement from $5 billion to $100 million in adjusted net capital.  However, at the same time ICE Clear required that entities organized as broker-dealers or future commission merchants hold 5% of customer funds as excess net capital.  This limitation ensured that, despite the decrease in capital required for membership, smaller banks and other entities would be unable to establish themselves as CDS market makers.

72.     ICE Clear's capital requirement for membership is important because Defendant dealers have also ensured that ICE Clear will only clear transactions to which its members are a party.  When ICE Clear was formed in December 2008, its policy was to only clear CDS transactions between ICE Clear members.  In December 2009, ICE Clear permitted end-users to clear trades but only if an ICE Clear member was on the other side of the transaction, and the

29

member had agreed that its customer could clear trades. The Defendant dealers have refused almost all requests by their customers for permission to clear trades. In the first quarter of 2011, for example, only $6 billion of the $18 trillion in CDS trades that ICE Clear cleared involved non-members as a party to the transaction.

73.     In a December 28, 2010 comment letter to the SEC, referenced above, the Department of Justice emphasized the importance of clearing as an input to derivatives trading and the anticompetitive effects of allowing a few participants to jointly control the clearing platform: "The creation of such a platform would be roughly analogous to the three or five largest airlines controlling all landing rights at every U.S. airport—the big carriers could use this control to disadvantage smaller carriers by restricting landing rights or raising their rivals' costs to access the airports."

74.     The Chicago Mercantile Exchange ("CME") began operating a CDS clearinghouse in December 2009. At that point in time, CME's clearinghouse was the only legitimate alternative to ICE Clear in the clearing of CDS trades. As described in more detail below, Defendants eliminated the CME clearinghouse as a competitive threat by jointly acting through Markit and ISDA to coerce the clearinghouse to agree to clear only trades to which a dealer is a party and by procuring CME's agreement to not launch electronic trading. This precluded non-dealers from trading as market makers (in more than small volumes) and then clearing their trades on the CME clearinghouse. Defendants thus eliminated the CME clearinghouse as a threat to their control over CDS trading, and preserved their control over access to clearing.

75.     Without access to clearing, smaller dealers, some of which sought to expand

their market making activities in competition with Defendants, and other companies such as

some hedge funds, which sought to begin trading as market makers in competition with

Defendants, have not been able to do so. Without access to clearing, these actual and potential

competitors have not been able to reduce their potential customers' counter-party risks to

tolerable levels.

    E.  **Defendants Restricted Their Pricing Information Joint Venture To Prevent it from Disclosing Real-Time Pricing Information to Customers or Competitors**

      76.    As described above, Defendant dealers, or entities affiliated with, owned by, or

controlled by Defendant dealers, own more than 70 percent of the voting shares of Markit Group

Holdings Ltd. Some Defendant dealers and Co-Conspirators, including Deutsche Bank,

Goldman Sachs, and JP Morgan, have had an equity stake in Markit Group Holdings Ltd. since

at least 2003. Markit Group Holdings Ltd., in turn, is the sole owner of Markit Group Ltd.

("Markit"), which is the sole entity with which the Defendant dealers share in real-time their

pricing offers known as pricing "runs." Markit also obtains some pricing information indirectly,

from customers.

      77.    Markit is in the business of, among other things, selling its parsed pricing

information to subscribers. The Defendant dealers have restricted how Markit disseminates

pricing information. Markit is required to wait 10-20 minutes before sending out the parsed data

from dealer runs. Because of the rapid price movements of CDS trading, this required time delay

permits Defendant dealers to quote prices different from their price indications in response to

customer inquiries. In contrast to the delay for non-dealers, Markit provides real-time pricing

information to the Defendant dealers.

      78.    A second entity, unaffiliated with the Defendants, CMA Vision, is also in the

business of selling CDS price information to subscribers. CMA Vision receives price information only from customers, not from the dealers. CMA Vision has the ability to parse the information available to it and to provide dealer-specific price data and/or average prices virtually in real time, but, as described in ¶¶ 85-86 below, it has been coerced by Defendants not to do so.

79. Defendant dealers themselves provide limited CDS price information to the market. Rather than publicly announce the prices at which they are willing to buy and sell CDS, Defendant dealers periodically send "runs" in electronic messages on Bloomberg financial terminals to select customers with which they have transacted in the past. Moreover, the runs contain only "indications" of the prices at which Defendant dealers will buy and sell CDS. For example, a Defendant dealer may provide a customer an indication of 75 basis points (bps) as its bid and 85 bps as its ask for a single-name CDS. Defendant dealers sometimes simultaneously transmit different spreads to different customers.

80. Defendant dealers are not bound to trade at their indicated prices. Customers receiving Defendant dealers' runs must make a "reverse inquiry" via telephone, return Bloomberg message, or other mechanism to find out whether and at what price the dealer is actually willing to transact. Defendant dealers' actual prices routinely vary from their indicated prices, especially if the customer does not make a reverse inquiry almost immediately upon receiving the run. The Defendant dealers can and do use their knowledge of the customer's interest to adjust their market accordingly, or to "front run" the customer by buying or selling protection (whichever the customer wanted to do) from another dealer, thereby benefiting from the resulting price pressure created by the stacking of supply or demand. Defendant dealers have

also sent out runs that do not reflect their actual knowledge of market prices in order to misdirect their customers to Defendant dealers' advantage. Customers' extremely incomplete price information makes them vulnerable to this manipulation.

81.     CDS customers typically transact with only a few dealers and receive runs from only those dealers. Furthermore, out of concern that their reverse inquiries will be used against them by Defendant dealers, Defendant dealers' customers typically only make these inquiries of one or two dealers, even if they have received runs from additional dealers. This limits the number of dealers that can then intentionally move the market against them. But it also further restricts the price information on which they transact. It is commonplace for customers to trade CDS knowing actual prices of only one or two dealers. Customers do not know whether another dealer might have a better bid or ask price. In practice, despite the theoretical availability of thirteen competing major dealers, customers are able to obtain competing quotes from only one or two.

82.     Real time price data covering all dealers in the market would be very valuable to non-dealer market participants. It would allow them to see the full range of price indications in the market in a timely manner, creating greater competition among dealers, and minimizing a dealer's ability to mislead a customer as to the market price or to move the market against the customer's intended position.

83.     Each of the Defendant dealers has sought to prevent any company other than Markit from being able to parse their runs. Each has technologically altered its Bloomberg messages to make them unable to be forwarded (so that customers cannot forward them to data companies) or to manipulate the format in the messages sent to their customers (but not to

Markit) to make them difficult to parse. Defendant dealers also have included warnings in their Bloomberg messages that they own the information therein and that the information may not be used without their consent, which they have not granted.

84.     Defendants, wanting to retain their superior knowledge of pricing, and to prevent customers and would-be competitors from obtaining real-time price information, have threatened to retaliate against CMA Vision if it distributed their data in real time.

85.     Fearing retaliation, CMA Vision has waited 10-20 minutes before sending out the parsed data it obtains from some customers. This delay renders the data substantially less valuable to non-dealers, as the market price for a given CDS product can change from minute to minute. It also allows Defendant dealers to walk away from the prices quoted in their runs as stale, permitting them to advantageously adjust their prices in response to the customer's intended position.

86.     Absent their joint venture through Markit and the anticompetitive benefit of collectively restricting price information, each Defendant dealer, if it were acting in its independent interest, would be motivated to have its bid and ask prices circulated broadly to market participants in real time, to facilitate more CDS transactions.

87.     Absent the restrictions of its Defendant dealer owners, Markit, if it were acting in its independent interest, would seek to sell real-time pricing information because such information is more valuable and would command a higher price. Markit attempted to negotiate to secure Defendant dealers' consent to disseminate their data in real time. Initially, some Defendant dealers consented and some did not, but Markit has continued to refrain from sending out any Defendant dealer's data in real time. Non-dealers would find real time data from even a

34

single Defendant dealer to be quite valuable, and the sale of real time price data from the runs of one or more Defendant dealers would be lucrative business for Markit. Yet, non-dealers have not been able to obtain such data through Markit or anyone else.

88.     Defendant dealers have also restricted the availability of price information in others ways. Defendant dealers require their customers to enter into an ISDA Master Agreement before they will trade CDS. The form of that agreement was jointly established by Defendant dealers through their control of the relevant ISDA committee. The agreement includes a provision that gives the dealer, and not its trading partner, the sole right to disseminate information about the terms of the CDS transaction. There is no pro-competitive justification to give one party to the transaction sole control over the valuable data created jointly by both parties to the transaction.

**F.  Defendants Jointly Prevented the Entry of a Competing CDS Exchange and Clearinghouses**

89.     Beginning in the Summer of 2008, Defendant dealers and Co-Conspirator JPMorgan worked together, with the assistance of Markit and ISDA, which they control, to counter a serious threat to their control over CDS trading and their ability to obtain inflated CDS bid/ask spreads.

90.     In the Summer of 2008, a Chicago-based hedge fund, Citadel Investment Group, began work on a new functionality in the CDS market with a view to making the market more efficient, fair and transparent: an electronic trading exchange for commonly traded derivatives, including all CDS, that would give all interested traders electronic access to anonymous and firm bid and ask prices.

91.     Citadel offered the use of its technological trading expertise for a joint venture

35

with the Chicago Mercantile Exchange called CMDX. The purpose of the joint venture was to establish a clearinghouse and an electronic trading system that would display prices for CDS. On October 7, 2008, Citadel's owner, Kenneth C. Griffin, publicly announced that the CME-Citadel joint venture would create the first electronic trading platform for CDS, utilizing CME's clearinghouse and Citadel's technology for price discovery, and that the platform would be launched within 30 days. Exchange membership was to initially be open to dealers, banks, and institutional investors. Clearinghouse membership was to initially be open to dealers and non-dealers with sufficient capital; exchange members could either clear through their own clearing membership or through a clearinghouse participant.

92.     Proponents argued at the time that exchange trading would remove the systemic risk posed by a counterparty failure, make prices transparent, and offer simpler, more standardized settlement of contracts when an issuer defaults, according to an October 7, 2008 *Reuters* article titled "CME, Citadel to Jump into Default Swap Market." The exchange would allow anonymous trade execution and greater price transparency, elements that would increase participation and liquidity. Because transactions would be cleared, participants would not need to rely on the original counterparty in order to exit a trade. Moreover, Citadel advised that it would trade CDS on its exchange at narrower spreads than the Defendant dealers were offering.

93.     At the time, Craig Donohue, CEO of CME Group, was sanguine about the joint venture. He stated: "Recent market events highlight the urgent need to reduce counterparty credit risks in the CDS market as well as the other over-the-counter markets. Our innovative new partnership with Citadel, and our invitation to leading market participants to join this first-ever integrated solution, is a key turning point in improving the functioning of these important

36

markets. . . . This platform provides an important opportunity for market participants to demonstrate to customers and regulators alike how these markets can be better organized to meet legitimate hedging and trading needs while reducing operational and credit risks that have grown unchecked in the OTC market."

94.     Government regulators also recognized the benefit of central counterparty clearing of CDS transactions.  In October 2008, the New York Federal Reserve held a meeting with the Defendants, buy-side participants, and other CDS market participants to discuss CDS clearing and encourage the development of a system to clear CDS trades.  Four groups presented proposals for CDS clearing at this meeting:  CMDX, ICE Clear, Eurex, and NYSE Euronext. Citadel and CME spent millions of dollars building and testing CMDX.  In March 2009, CME and Citadel received final regulatory approval from the Securities and Exchange Commission (SEC) to clear credit default swaps (CDS) through CMDX.  With that announcement, market watchers anticipated that "the business of central counterparty (CCP) clearinghouses is in full swing."  Industry observers expected full-blown competition to break out as the various CCPs begin courting customers for order flow to send through their respective clearinghouses.

95.     Despite this and similar expressions of confidence in the new clearing entity and exchange, and amidst considerable media fanfare, the proposed electronic exchange and clearinghouse soon ran into fierce and concerted opposition by the Defendant dealers, which stood to lose large amounts of money if, among other things, end-users were able to connect directly with one another through an exchange and then clear their trades, thus removing the major banks as essential dealers needed for every CDS transaction.  Around the same time, moreover, Defendant dealers formed ICE Clear as an alternative clearinghouse to the one that

Citadel and CME were starting.

96.     On June 1, 2009, following a May 29th conference call of the ISDA credit steering committee and the 'buy-side' clearing working group, Samuel Cole, then-chief operating officer of New York-based Blue Mountain Capital Management LLC, a hedge fund whose founders helped pioneer CDS and one of the firms that had partnered with Citadel and the Chicago Mercantile Exchange, wrote a "Note to the Dealers" that provided key insight into the obstructionist methods of the Defendant dealers to prevent the creation of a viable competing clearing and exchange entity.  The letter was copied to other industry participants and the New York Federal Reserve.  Named in the letter as other "Buyside Founding Members" of CMDX, the CME-Citadel clearing and exchange joint venture, were PIMCO, BlackRock, DE Shaw and Alliance Bernstein, in addition to Citadel and BlueMountain.

97.     Cole wrote that the large Defendant dealers were obstructing the efforts of the Chicago Mercantile Exchange and Citadel to establish a legitimate clearinghouse to compete with the dealer-dominated ICE Clear.  He asserted that CMDX was non-exclusive and that its ownership and governance structure included both the "Dealers" and the "Buyside."  He charged the dealer banks on the call with "dissembling and obfuscation"; "[t]he Dealers suggested more than once that there is room for only one solution in the market and that they are building that one solution right now.  This calls into serious question the Dealer's [sic] sincerity in working with the Buyside to assess fairly the various CCP [*i.e.*, central counterparty or clearinghouse] alternatives . . . ."  Whereas the "Buyside" "raised fundamental commercial issues . . . based on due diligence and review," he continued, "the Dealers['] objections are often based on sweeping generalizations."  For instance, he noted, the dealers said that CME's CMDX risk model, based

38

on including CDS in CME's "single-pool default fund" was flawed, despite approval by the

Federal Reserve, CFTC, SEC, a Federal Reserve-approved independent third-party consulting

firm and others. "No mention was made," he wrote, "of dealer oligopolistic dominance of most

major market structures in the credit markets, to include interests in and influence over ICE

Clear, Markit, and ISDA. Most tellingly, he added: "The stunned silence that you heard from

Buyside firms on Friday's call was the disquieting realization that the Dealer community may be

filibustering to protect its oligopoly and not seriously engaged in working with the Buyside to

develop a clearing solution."

98. On information and belief, the Defendant dealers threatened representatives of

CME with withdrawing the dealer banks' business from CME if it continued its venture with

Citadel to institute electronic trading of credit default swaps.

99. Defendant dealers also used their control of Markit and ISDA to defeat the

electronic exchange and neutralize the threat of the CME clearinghouse. Citadel and CME

sought to work with Markit, as it owned certain claimed intellectual property rights to the most

frequently traded CDS indices. Because many CDS transactions involve CDS indices, the

Citadel/ CME exchange and clearinghouse would be greatly handicapped if they could not trade

and clear the most popular CDS indices. Markit, controlled by Defendant dealers, insisted that

the new clearinghouse and exchange handle only trades that involved at least one dealer bank,

because the banks are the main parties that have licenses with Markit. This arrangement gave

the Defendant dealers the ability to control which, if any, CDS trades occurred and were cleared

on the CME/Citadel exchange and clearinghouse.

100. Because Citadel and CME would have been severely handicapped without

licenses from Markit and ISDA, they had no good viable alternative but to accede to Markit's and ISDA's demands, and they reached licensing agreements with Markit and ISDA in March 2009. However, the licenses were for the clearing platform only, and Markit and ISDA would not agree to licenses for exchange trading. Moreover, Defendant dealers intentionally protracted the licensing negotiations between CME and Markit and ISDA, which delayed the launch of CME's clearinghouse and provided more time for Defendant dealers to get ICE Clear running and establish a head start on CME's clearinghouse.

101. ISDA's agreement to deny CMDX the necessary licenses was contrary to ISDA's own economic interest. Had ISDA allowed CMDX to use the existing ISDA Master Agreement, exchange-traded CDS would have mirrored the conventions of OTC CDS, including use of the ISDA Credit Derivatives definitions, the ISDA Determinations Committee, and the ISDA auction process. It was thus in ISDA's economic interest to participate and promote CMDX, since ISDA would have gained licensing revenues resulting from the increased number of market participants and increased volume of CDS transactions.

102. In September 2009, faced with a lack of support from Defendant dealers and Markit's and ISDA's refusal to grant the necessary licenses for exchange trading, CME and Citadel were forced to shutter their nascent electronic exchange. CME announced that CMDX would be changed into a clearing-only service, which was eventually re-named CME Clearing. Buy-side founding members included AllianceBernstein, BlackRock, BlueMountain Capital Management, the D. E. Shaw group, PIMCO, and Citadel (which, with the demise of the exchange, was no longer a joint venture partner). The dealer-side founding members were Barclays, Citi, Credit Suisse, Deutsche Bank, Goldman Sachs, JPMorgan, Morgan Stanley, and

UBS.

103.     According to a June 9, 2010 *Market Watch* article titled "CDS Clearinghouses Challenge Wall Street's Rules," a trader with relevant knowledge said that "the electronic trading platform was quietly killed because Citadel wanted to 'trade within the current market spreads.'"

104.     Having caused the demise of the electronic exchange, Defendant dealers then took steps to limit the effectiveness and competitiveness of CME's clearinghouse.  As part of a secret agreement with CME in December 2009, Defendants and certain other dealers agreed to join the CME clearinghouse in return for CME's agreement to refrain from setting up a CDS electronic exchange until at least December 2012.  A December 11, 2010 *New York Times* article reported that two people with knowledge of the CME clearinghouse said that the Defendant dealers refused to get involved with that clearinghouse unless CME dismissed Citadel and the entire plan for electronic trading.

105.     This deal not only shielded Defendant dealers from the emergence of an electronic CDS exchange, it also permitted Defendant dealers to exert control over, and thus marginalize, CME Clearing.  After Defendant dealers joined the CME clearinghouse, CME set up a risk committee that was populated mainly by Defendant dealers and certain other dealer-bank representatives, which stripped the committee of any semblance of independence. Defendant dealers used their control of this committee to promulgate rules that denied the clearinghouse the opportunity to achieve more than *de minimis* clearing volume.  For example, they established (and maintained for many months) a daily clearing cap of $2 billion under the pretense that the margin methodology required more work, a level that barely permitted any clearing volume.  Defendant dealers also used their positions on the risk committee to limit who

else could join the clearinghouse. Defendant dealers have also cleared very few CDS transactions through CME, instead clearing almost all their CDS transactions through ICE Clear. As of mid-March 2012, CME had cleared CDS contracts with an aggregate open interest of only $33.3 billion, compared to $738 billion in open interest cleared through ICE Clear as of February 2013. This conduct ensured that CME Clearing would not generate sufficient volume, pricing data, or influence to threaten Defendants' control of the CDS market.

106.    Defendant dealers likewise refused to clear all but a *de minimis* volume of CDS trades on any other competitive clearinghouse. As of January 2012, LCH.Clearnet had cleared CDS trades with a gross notional value of only €58.7 billion ($76 billion) and an aggregate open interest of only €4.6 billion ($6 billion). Clearinghouses operated by Eurex and Euronext Liffe have already shuttered their businesses, after the former failed to clear even $1 billion worth of CDS, and the latter did not manage to clear a single CDS trade.

107.    In contrast to the earlier bullish predictions of CME CEO Craig Donahue for the "first ever integrated solution" (i.e., clearing and electronic trading) and his characterization of the "urgent need" to address counterparty credit risks in the CDS market, another CME official, Kim Taylor, the president of the CME's clearinghouse, later explained that "'the market' simply wasn't interested in [Citadel's] Mr. Griffin's idea." (*The New York Times*, December 12, 2010.) In view of Mr. Cole's June 2nd "Note to Dealers," and in light of the accounts cited above, Ms. Taylor's reference to the "market" certainly appears to be to the Defendant dealers.

108.    Analysts have stated that Citadel's blockaded electronic trading platform would have brought more price transparency and more competition, which would have translated into tighter bid-offer spreads and lower profits for the Defendant dealers.

109.    In early December 2010, Mr. Griffin, owner of the hedge fund Citadel

Investment Group, told the *New York Times* that end users have paid the price for not yet having

electronic trading.  According to the *New York Times*' December 11, 2010 article, he estimated

that end users have been deprived of tens of billions of dollars by the Defendant dealers and the

relevant institutions they control.  Mr. Griffin said that electronic trading would remove much of

this "economic rent the dealers enjoy from a market that is so opaque."

110.    Mr. Griffin commented further on the motivation of the Defendant dealers in

shutting down the prospect of electronic trading:  "It's a stunning amount of money.  The key

players today in the derivatives market are very apprehensive about whether or not they will be

winners or losers as we move forward towards more transparent, fairer markets, and since

they're not sure if they'll be winners or losers, their basic instinct is to resist change."

111.    Defendants' conduct eliminated a significant alternative means of trading CDS

that would have forced Defendant dealers to compete more vigorously for investor business, and

would have shifted the market to exchange trading for all standardized CDS products.  Both the

enhanced competition and the exchange trading, with its greater price transparency, anonymous

trading, and more numerous potential trading partners, would have yielded lower CDS spreads.

As a comparison, when stocks listed on the NASDAQ went from OTC trading to exchange

trading in 1971, spreads quickly fell by approximately 40 percent.

112.    Similarly, the introduction of exchange trading to the equity options market

substantially reduced spreads while enabling new entrants and increasing trading volume.  In

April 1973, the Chicago Board Options Exchange ("CBOE") opened an exchange and

clearinghouse for equity options.  By 1977, almost all equity options were exchange traded, with

spreads compressing significantly. In addition, volume increased from 900 options contracts the day CBOE began exchange to over 1 million by the end of 1973. Within 10 years, half a million options contracts were traded on the exchange every single day. But for Defendants preventing CMDX from opening as planned in the Fall of 2008, CDS spreads and trade volume would have followed a similar pattern as with NASDAQ and equity options. Members of the class would have seen compressed spreads on their CDS trades, and the exchange and clearinghouse would have provided them more CDS trading partners and greater CDS liquidity.

### G. Defendants Jointly Denied Non-Dealer Market Participants the Advantages of Trading Through Brokers

113. Approximately 83% of CDS transactions occur between dealers. When dealers trade CDS with each other, they use intermediaries called inter-dealer brokers ("IDBs"). Dealers submit the prices at which they are willing to buy or sell CDS with another dealer to the interdealer brokerage. The brokerage solicits interest from other dealers and attempts to match bids and offers. Dealers see each other's quotes, but not each other's identity (to maintain anonymity), and can choose to enter CDS transactions at the quoted prices without negotiation or inquiry and without submitting their own quotes. IDBs operate both voice brokerages and electronic brokerages. ICAP, Maxcor, Creditex and GFI are the major CDS interdealer brokers.

114. This system provides the Defendant dealers with many of the benefits that they deny to non-dealers: the ability to quote bid and ask prices anonymously, the ability to accept quoted bid and ask prices without further inquiry, and ready knowledge of a larger array of bid and ask prices. Thus, the IDB system possesses some of the key attributes of an electronic exchange and demonstrates that CDS are suitable for exchange trading.

115. Despite the advantages of the inter-dealer broker system, the Defendant dealers

44

have prevented non-dealers from participating in that system. Specifically, Defendant dealers have threatened the IDBs with a loss of business if they facilitate CDS transactions with non-dealers. For example, GFI attempted to launch an independent inter-dealer broker that would give non-dealers access to the IDB system. In response, the Defendant dealers that were using GFI's services threatened to pull all their business from GFI, and GFI subsequently dropped its plans to provide its services to non-dealers.

116.    In addition to maintaining their informational advantage over non-dealers, Defendant dealers have forbidden the IDBs from providing their services to non-dealers for the additional reason that they fear that the IDBs would begin brokering trades between non-dealers, thereby shutting Defendant dealers out of those trades. Each Defendant dealer has had a reason to be concerned that another Defendant dealer would attempt to generate additional CDS transactions with non-dealers by permitting an IDB to facilitate such trades. This could lead to a loss of CDS business to the Defendant dealer utilizing IDB services in this way, and could result in additional lost business if the IDB began brokering CDS trades between non-dealers. No Defendant dealer has broken ranks with the other Defendant dealers to attempt to increase its CDS business with non-dealers through the use of IDB services.

## MARKET CHARACTERISTICS FACILITATE RESTRAINTS OF TRADE

117.    The structure and characteristics of the CDS market in the United States are conducive to the restraints of trade alleged here, and have increased the harm to competition.

### A. **Commodity-Like Product**

118.    The vast majority of CDS—and all CDS at issue in this case—are homogeneous, commodity-like products, and the terms, conditions, and composition of one Defendant dealer's

CDS easily can be substituted for the same CDS offered by another Defendant dealer. Indeed, most credit default swaps are documented using the Standard North American Contract, issued by ISDA.

119.     Because standardized CDS are commodity-like products, purchasers make purchase decisions based predominantly on price.

### B.  Significant Barriers to Entry

120.     As described above, the presence of significant entry barriers to potential competitors that could otherwise cause the incumbents to reduce their prices facilitates restraints imposed by Defendants.

121.     The CDS market is characterized by high entry barriers. Due to Defendants' and their Co-Conspirators' control of the market in general, and CDS pricing information, clearinghouse membership, and access to the inter-dealer broker system in particular, no dealer or firm outside the incumbent dealers has meaningfully been able to enter the market and make a meaningful market impact on CDS pricing. The experiences of CME and Citadel described above, are illustrative.

### C.  Dealer Side of Market Is Concentrated

122.     A high degree of concentration facilitates restraints imposed by the Defendants.

123.     The Defendant dealers control a very high percentage of the United States CDS market, collectively possessing a market share well in excess of 90%, as indicated above. Moreover, the vast majority of all cleared CDS transactions to date have been cleared by ICE Clear.

124.     Throughout the Class Period, the Defendant dealers collectively possessed

market power with respect to trading CDS with non-dealers, and, with their Co-Conspirators, dominated the critical infrastructure for this market. Consequently, non-dealer market participants could not escape having to pay Defendant dealers' inflated spreads by utilizing a non-conspiring dealer or a non-conspiring clearinghouse or exchange.

### D. **Customer Side of Market Is Unconcentrated**

125.    Any holder of a bond or other credit instrument may seek to buy CDS in order to hedge the risk of a default event. CDS have become a widely used financial tool for banks and a wide variety of other customers: corporations and private companies, state and local governmental entities, pension funds, and many other financial institutions.

126.    In addition, many other entities buy and sell CDS as an investment, thereby providing liquidity to CDS trading.

### E. **Demand Is Inelastic**

127.    Price elasticity of demand is the measure of responsiveness in the quantity demanded for a product as a result of change in price of the same product. Inelastic demand is a market characteristic that facilitates restraints on competition and collusion, allowing producers to raise their prices without triggering customer substitution and lost sales revenue. Inelastic demand is another indicator that restraints on competition of the type alleged here would be successful.

128.    The demand for CDS is inelastic due to their unique financial properties and characteristics. Defendant dealers continue to report higher profits from CDS trading than from trading comparable financial products not subject to anticompetitive restraints.

**F.  Market Characterized by Cooperative Practices**

129.     During and before the Class Period, Defendants repeatedly engaged in communications and meetings in furtherance of the alleged restraints.  Some of the places where these communications and meetings occurred are described below.

### 1.  ICE Clear Risk Committee Meetings

130.     Representatives of the Defendants meet on the third Wednesday of every month in midtown Manhattan, ostensibly in connection with their firms' membership on ICE Clear's exclusive and secretive risk committee.

131.     Many of these same people also hold influential positions at other clearinghouses, according to the December 11, 2010 *New York Times* article, and thus regularly meet in connection with the business of those clearinghouses.

### 2.  Dealings Among Defendant Dealers, IntercontinentalExchange, ICE Clear, and Markit

132.     The Defendant dealers and ICE interacted frequently during the period when they were in the process of establishing ICE Clear.

133.     During the same general period during the establishment of ICE Clear, the Defendant dealers, ICE, and Markit had occasion to and did communicate regarding, at the least, the issue of using Markit's pricing data in CDS clearinghouses.

134.     The Defendant dealers and ICE each share evenly in the revenue ICE Clear generates.

135.     The Defendant dealers are clearing members of ICE Clear.

136.     The Defendant dealers collectively are majority shareholders of Markit.

### 3. International Swaps and Derivatives Association

137.     The Defendant dealers are "Primary Members" of the powerful ISDA trade association, which helps govern the derivatives industry.  They regularly attended ISDA meetings.

138.     As the December 11, 2010 *New York Times* article notes, many of the same people on ICE Clear's risk committee also hold influential positions on committees at the ISDA.

139.     ISDA "represents participants in the privately negotiated derivatives industry," and its "members include most of the world's major institutions that deal in privately negotiated derivatives."

140.     ISDA's 2011 and 2010 Board of Directors included representatives from several of the Defendant banks.

141.     The ISDA has held its Annual General Meeting in the spring at various locations across the globe.  For example, ISDA's 24th Annual General Meeting, sponsored by Barclays, was held in Beijing on April 22-23, 2009, and ISDA's 25th Annual General meeting, sponsored by Morgan Stanley, took place in San Francisco on April 21-23, 2010.

142.     Program agendas from ISDA annual meetings provide for members to attend luncheons, dinners, off-site receptions and "after-hour parties."

143.     The ISDA also holds smaller, more specialized meetings and conferences more frequently throughout the year.  One of the primary activities of ISDA is the development of standard swap documents, including documents for CDS.  This is done with the direct participation of dealer banks, including the Defendant dealers.  The form of CDS documents must be compatible with the clearing process.  Therefore, the ISDA document development

process has been a useful venue for the Defendant dealers to secure the position of ICE Clear as the dominant clearing entity for CDS.

144.     Such communications as those discussed above provide the opportunity for participants to fine-tune the restraints on competition.

## GOVERNMENT INVESTIGATIONS

### A.  2009 Department of Justice Investigation of Anticompetitive Practices in the CDS Market

145.     In July 2009, the Antitrust Division of the DOJ opened an investigation into the possibility of anticompetitive practices in the CDS market.  According to Alisa Finelli, a spokeswoman for the DOJ, the DOJ's investigation "[i]s focused on the possibility of anticompetitive practices in the credit derivatives clearing, trading, and information services industries."

146.     The DOJ's investigation is reminiscent of a similar investigation the DOJ conducted during the mid to late 1990s, in which the DOJ discovered that NASDAQ market makers, several of which are Defendants in this action, were secretly colluding to protect their own profits by maintaining artificially wide bid-ask spreads for NASDAQ-listed stocks.

147.     Specifically, the Antitrust Division is investigating whether ICE Clear's member dealer banks' part ownership of Markit gives them privileged access to credit default spreads and trading patterns; whether Markit permits the use of its indices by another clearinghouse only if every swap guaranteed by the clearinghouse includes an ICE Clear member bank; and whether Markit requires services to be bundled services.

148.     The DOJ is also investigating Markit for potential anticompetitive practices ranging from requiring customers to buy bundled services to restricting which trades can be

50

cleared in the credit default swap market, according to an August 3, 2009 Bloomberg article titled "Markit Credit-Swap Services Said to Be Part of Antitrust Probe." Among other examples of Defendants dealers' control over and restriction of access to Markit's data information, the DOJ allegedly was focusing on the special access of Markit's Defendant dealer bank shareholders to price information and the advantages they enjoy as owners and providers of prices and trading patterns for credit default swaps. Indeed, Markit has acknowledged that its "privileged relationships with 16 shareholder banks" gives it "unparalleled access to a valuable dataset spanning credit, equities, and the broader OTC derivative universe."

149. The DOJ's concerns over the lack of transparency in trading and pricing information in the derivatives markets are not new. In fact, in its December 28, 2010 comment letter to the CFTC, referenced above, the DOJ discussed the numerous anticompetitive effects of allowing a small number of dealer banks to control execution and clearing platforms. In addition to warning of the potential that the dealers "might use such a platform to exclude rival dealers or other market participants that would otherwise compete for trading volume," the DOJ warned the CFTC that "[a] dealer-controlled trading platform also might release less innovative data products or be less transparent than would an independent platform."

150. Both the DOJ and the EC have expressed worries that buyers are paying higher prices for CDS than they would in a more competitive market.

**B. 2011 European Commission Investigation Into Abusive Practices Regarding CDS Pricing Information and Clearing**

151. As stated in ¶ 3 above, on July 1, 2013, the European Commission, which serves as the European Union's executive arm and antitrust watchdog, announced that it had issued statements of objections to 13 investment banks, the International Swaps and Derivatives

Association, and Markit, charging them with anti-competitive behavior to block electronic exchanges from entering the credit derivatives business.

152.    In April 2011, the EC opened up two separate antitrust investigations concerning CDS trading in Europe and whether the relationships between large financial firms, market information providers, and clearinghouses have distorted competition in European trading of CDS.

153.    In a statement made in April 2011 to the New York Times, the European Union Competition Commissioner, Joaquín Almunia, stated:  "Lack of transparency in markets can lead to abusive behavior and facilitate violations of competition rules. . . .  I hope our investigation will contribute to a better functioning of financial markets and, therefore, to more sustainable recovery."

## ANTITRUST VIOLATIONS

154.    Beginning at least as early as October 7, 2008, and continuing to the present date, Defendant dealers have restrained trade by restricting ICE Clear from clearing CDS trades for rival dealers, by restricting Markit and other potential sources of pricing information from providing timely, complete, and accurate CDS price information to customers or rival dealers, by blocking entry by a competing exchange and clearing entity, and by preventing rival dealers from trading through inter-dealer brokers, with the purpose and effect of artificially inflating the bid/ask spread paid to buy and sell CDS in the United States.  Defendant dealers' conduct constitutes an unreasonable restraint of interstate trade and commerce in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

155.    Defendants' unlawful conduct has had at least the following anticompetitive

effects throughout the Class Period:

    a.   Competition in the trading of CDS with non-dealer market participants has been artificially restrained;

    b.   The supply of timely, complete and accurate CDS price information has been suppressed;

    c.   The prices of CDS sold by Defendants to Class Members have been artificially inflated;

    d.   The prices of CDS sold by Class Members to Defendants have been artificially depressed;

    e.   Non-dealer market participants and other active participants in the CDS market have been deprived of the benefit of free and open competition in the buying and selling of CDS ; and

    f.   Innovations such as exchange trading of CDS and electronic trading of CDS have been prevented.

156.    Defendants have used their market power resulting from this suppression of competition, as well as their superior knowledge of CDS pricing relative to non-dealers, collusively maintained, to widen bid/ask spreads when trading CDS with non-dealers.

157.    Throughout the Class Period, Plaintiff and the other Class members purchased CDS from and sold CDS to Defendant dealers (or their subsidiaries or controlled affiliates) and their co-conspirators, paid supra-competitive bid/ask spreads directly to Defendant dealers and their co-conspirators, and were thereby injured in their business and property in an amount presently undetermined.

## MARKET POWER

158.    Defendants collectively have the power to exclude competition to trade CDS with non-dealers, and to widen bid/ask spreads beyond competitive levels when trading CDS with non-dealers.

159.     The Defendant dealers' collective market power is evidenced by the supra-competitive prices they charge non-dealers for CDS and the sub-competitive prices they pay non-dealers for CDS.

160.     Defendants' joint market power is further seen by their exclusion of non-dealers from competing as market makers by denying them access to clearing, to inter-dealer broker services, and to electronic trading.

161.     Defendants' collective market power is further revealed by their collective ability to deny non-dealers access to timely, complete and accurate CDS price information.

162.     Defendants' joint market power is also evidenced by their collective ability to dictate the terms on which CDS is transacted.  They control the ISDA committees that determine the provisions of the standard contracts that govern CDS transactions. The governing ISDA agreements provide built-in advantages to Defendant dealers in every CDS transaction by allowing them control over (a) counterparty CDS trading data without any reciprocal rights; (b) any determination whether a credit event has occurred, and (c) the auction process used to settle CDS where a credit event has occurred.

163.     Moreover, Defendants' market power is evidenced by their overwhelming dominance of CDS trading in the United States during the Class Period, when they have been parties to approximately 93 percent of all CDS transactions in the United States by notional value. Defendant dealers recognize each other as their principal competitors in the trading of CDS.

## RELEVANT MARKET

164.     The relevant product market for the claims asserted in this case is the purchase

and sale of CDS in transactions with non-dealers. As a practical matter non-dealers cannot avoid the inflated bid/ask spreads received by Defendant dealers by trading in other types of financial products. CDS offers a means of hedging credit risk or speculating on credit risk that is unique among financial products. Other instruments that allow market participants to transact in credit risk are highly imperfect substitutes for CDS, for several reasons. The closest substitute to CDS is the underlying debt instruments (i.e., the bonds and loans issued by the reference entities). Compared to CDS, bonds and loans issued by a given reference entity tend to be more thinly traded, and it can be difficult to find a particular desired maturity. For investors who wish to take credit risk, term financing for the purchase of corporate debt can be difficult to obtain, whereas financing is embedded in the CDS product. Put another way, in a CDS contract, unlike with a bond or loan, an investor is not required to invest the entire notional amount. For example, a $10 million notional amount of CDS might require nothing more than a $500,000 initial margin and a daily maintenance margin. Moreover, investment in corporate debt involves risks other than pure credit risk. For example, most corporate bonds pay interest at fixed rates, and for this reason their valuation is dependent in part on overall market interest rates. CDS presents a more "pure play" on credit risk, as the interest rate sensitivity for an amount of credit exposure taken through CDS will generally be a small fraction of the interest rate risk of a bond investment. Lastly, for investors who wish to hedge credit risk, or to go "short" as a speculative play, CDS presents the only realistic means of establishing such a position for an extended period of time. Inter-dealer transactions by definition are not available to end users. Dealers trade CDS with each other at different prices and through different mechanisms than are available to non-dealers.

165.     The relevant geographic market for the claims asserted in this case is the United

States.

166.     Defendants have a dominant share of the relevant market as defined herein.

They are parties to the large majority of all CDS transactions with non-dealers in the United

States.

## INTERSTATE TRADE AND COMMERCE

167.     The trade and commerce relevant to this action is the trading of CDS between

dealers and non-dealers in the United States.

    a.  Plaintiff and the other Class members are located throughout the United States
and purchased and sold CDS in transactions with the Defendant dealers
throughout the Class Period.

    b.  The Defendant dealers are located throughout the United States and throughout
the Class Period have been the largest CDS traders in the United States.

168.     During the Class Period from October 7, 2008 through the present, Defendant

dealers traded substantial numbers of CDS with Plaintiff and Class members across state lines in

an uninterrupted and continuous flow of interstate trade and commerce.  The activities of the

Defendant dealers and their co-conspirators, as described herein, were within the flow of

interstate trade and commerce, had a substantial effect on interstate trade and commerce, and

unreasonably restrained interstate trade and commerce.

## CLASS ACTION ALLEGATIONS

169.     Plaintiff brings this action on behalf of itself, and as a class action, pursuant to

the Federal Rule of Civil Procedure 23(a), (b)(2) and (b)(3), on behalf of the following class (the

"Class"):

All individuals and entities located in the United States or abroad who, during the period

from October 7, 2008 through the present, directly purchased CDS from or directly sold

CDS to Defendants in the United States. Excluded from the Class are Defendants, their

parents, subsidiaries, and affiliates, co-conspirators, and all governmental entities.

170.    The members of the Class are so numerous that joinder of all Class members in

this action is impracticable. Due to the nature of the trade and commerce involved, Plaintiff

believes that the members of the Class are geographically dispersed throughout the United

States, and that joinder of all Class members would therefore be impracticable. While the exact

number of Class members is unknown to Plaintiff at this time, Plaintiff believes that there are, at

least, thousands of members of the Class and that their identities can be learned from

Defendants' books and records.

171.    Plaintiff's claims are typical of the claims of the members of the Class, because

Plaintiff and all members of the Class were damaged by the same wrongful conduct of the

Defendant dealers alleged herein.

172.    Plaintiff will fairly and adequately protect the interests of the Class. The

interests of Plaintiff are coincident with, and not antagonistic to, those of the Class. In addition,

Plaintiff is represented by counsel who are experienced and competent in the prosecution of

complex class action and antitrust litigation.

173.     Questions of law and fact common to the members of the Class are important,

and predominate over questions, if any, which may affect only individual members, because

Defendants have acted on grounds generally applicable to the entire Class. Among the questions

of law and fact common to the Class are:

    a.   Whether the Defendant dealers, among themselves, and/or with their Co-

Conspirators, engaged in the conduct alleged herein;

b. The duration and extent of the conduct alleged herein;

c. Whether each Defendant dealer was a participant in the conduct alleged herein;

d. Whether the conduct of the Defendant dealers alleged herein violates Section 1 of the Sherman Act, 15 U.S.C. § 1;

e. Whether Defendants collectively had the power to exclude competition to trade CDS with non-dealer market participants and to obtain supra-competitive bid/ask spreads when trading CDS with non-dealers;

f. Whether Defendants' unlawful conduct injured Plaintiff and the other Class members in their business or property;

g. The appropriate measure of the Class' damages; and

h. The appropriate injunction needed to restore competition.

174. Class action treatment is superior to the alternatives, if any, for the fair and efficient adjudication of the controversy alleged herein. Such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the duplication of effort and expense that numerous individual actions would engender. Class treatment also will permit the adjudication of relatively small claims by many Class members, who could not afford to individually litigate an antitrust claim against large corporate defendants and generally are not willing to risk retaliation by Defendants for filing individual claims. There are no difficulties likely to be encountered in the management of this class action that would preclude its maintenance as a class action, and no superior alternative exists for the fair and efficient adjudication of this controversy.

## **FRAUDULENT CONCEALMENT**

175. By its very nature, the unlawful activity, as alleged herein, was self-concealing.

58

Defendants conspired and engaged in secret and surreptitious activities in order to manipulate the CDS market and maintain inflated CDS spreads.

176.    Defendants fraudulently concealed their anticompetitive activities by, among other things, engaging in secret communications in furtherance of the conspiracy.

177.    Defendants agreed among themselves not to discuss publicly or otherwise reveal the nature and substance of the acts and communications in furtherance of the agreements alleged herein.

178.    None of the facts or information available to Plaintiff, if investigated with reasonable diligence, could or would have led to the discovery of the conspiracies alleged in this Complaint. Plaintiff was lulled into believing that the CDS prices offered to it were the result of market conditions, rather than the product of Defendants' manipulation and collusive activities.

179.    As a result, Plaintiff was prevented from learning of the facts needed to commence suit against Defendants for the manipulative and anticompetitive conduct alleged in this Complaint until at least July 2009 when the DOJ publicly acknowledged its investigation of Markit.

180.    There are many reasons why these facts could not have been known:  (1) Defendants' trades and trading strategies are not public information; (2) clearinghouses do not publish information concerning particular trading entities, including trading between dealer entities; and (3) the bilateral, non-exchange traded nature of the trades at issue further obscures what Defendants were, and are, doing at any particular time.

181.    Because of Defendants' active steps, including fraudulent concealment of their conspiracy to prevent Plaintiff from suing them for the anticompetitive activities alleged in this

Complaint, Defendants are equitably estopped from asserting that any otherwise applicable limitations period has run.

## DEMAND FOR JURY TRIAL

182. Pursuant to Federal Rule of Civil Procedure 38(b) and otherwise, Plaintiff respectfully demands a trial by jury.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment against Defendants as follows:

a. That the Court determine that this action may be maintained as a class action under Rules 23(b)(2) and (b)(3) of the Federal Rules of Civil Procedure;

b. That the Court adjudge and decree that Defendants' actions alleged herein violate Section 1 of the Sherman Act, 15 U.S.C. § 1;

c. That Plaintiff and members of the Class recover their actual damages, in an amount to be determined a trial, and threefold the damages they have sustained as a result of the antitrust violations alleged herein;

d. That Plaintiff recover its reasonable attorneys' fees and costs;

e. That Plaintiff recover post-judgment interest on the above sums at the highest rate allowed by law;

f. That the Defendants be enjoined from continuing their unlawful conduct;

g. That the Court enter a structural injunction to engender competition in the CDS market, including among other things: (1) a requirement that Defendants eliminate the restrictions in their clearing and price-information joint ventures that prevent dealing with qualified customers and rival dealers; (2) requiring Defendants to stop interfering with independent efforts to institute exchange trading and electronic trading of CDS; and (3) requiring Defendants to stop interfering with efforts by IDBs to offer their services to non-dealer market participants; and

h. That Plaintiff be granted such other and further relief as the nature of the case may require or as the Court may deems just and equitable.

Dated: July 29, 2013

    / s / George A. Zelcs
George A. Zelcs
Korein Tillery LLC
205 North Michigan Plaza
Suite 1950
Chicago, Illinois 60601
Tel: (312) 641-9750
Fax: (312) 641-9751
gzelcs@koreintillery.com

Steven M. Tillery
Robert King
Giuseppe S. Giardina
Korein Tillery LLC
One U.S. Bank Plaza
505 N. 7th Street, Suite 3600
St. Louis, MO 63101-1625
Tel:  (314) 241-4844
Fax:  (314) 241-3525
stillery@koreintillery.com
rking@koreintillery.com
ggiardina@koreintillery.com

Roberta D. Liebenberg
Jeffrey Istvan
Adam J. Pessin
FINE, KAPLAN & BLACK, R.P.C.
One South Broad Street
Suite 2300
Philadelphia, PA  19107
Tel:  (215) 567-6565
Fax:  (215) 568-5872
rliebenberg@finekaplan.com
jistvan@finekaplan.com
apessin@finekaplan.com

61